COUNCIL OF COMMUTER ORGANIZATIONS, et al., Petitioners,

v.

Anne M. GORSUCH, Administrator, and the United States Environmental Protection Agency, Respondents.

No. 853, Docket 81–4210.

United States Court of Appeals, Second Circuit.

Argued April 8, 1982.

Decided June 16, 1982.

William Hoppen, New York City, for petitioners.

Lawrence R. Liebesman, Dept. of Justice, Washington, D. C. (Carol E. Dinkins, Asst. Atty. Gen., Dept. of Justice, Donald W. Stever, Jr., Dept. of Justice, Christian Kaneen, U.S.E.P.A., Washington, D. C., and Warren Llewellyn, U.S.E.P.A., New York City, on the brief), for respondents.

Before LUMBARD, FRIENDLY and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

This appeal is the latest in a long line of efforts by environmental groups and concerned citizens to secure a reduction of pollution levels in the New York City metropolitan area as required by the Clean Air Act. In previous efforts, the environmental groups obtained a court order enforcing New York's earlier decision to impose tolls on bridges to Manhattan as one of many strategies chosen by the State to reduce intolerably high levels of pollution in the New York City area. But before the bridge toll strategy was implemented, Congress in the 1977 Amendments to the Clean Air Act gave states the option of replacing intracity bridge toll strategies with other transportation-related strategies including the improvement of public transportation. New York opted for this change in approach and, after obtaining a modification of the court order, elected not to impose the bridge tolls. Although Congress expressly required that New York's state implementation plan (SIP) be revised to include the mass transit improvement program by August 1, 1978, if New York was to discard the bridge toll strategy, the Environmental Protection Agency (EPA) did not give final approval to New York's mass transit improvement plan until September 9, 1981. EPA approved the plan based upon New York's commitment to submit additional implementing details and schedules by July 1, 1982. The Council of Commuter Organizations and other concerned individuals and groups petition for review of EPA's approval, contending that New York's plan does not meet New York's basic transportation needs and contains insufficient implementing schedules and details. We find EPA's failure to take final action until more than three years after the express statutory deadline for SIP revision inexcusable, and we do not in any way condone the timing of EPA's belated approval. Nevertheless, now that EPA has finally acted, we conclude that its construction of the *substantive* requirements of the mass transit provisions of the Clean Air Act falls within the permissible range of discretion afforded to an agency interpreting the statute it administers. Accordingly, we uphold EPA's approval of New York's public transportation improvement plan pending an adequate submission of additional implementing details and schedules by July 1, 1982. We deny the petition for review, except to the extent that EPA's order prematurely lifted the moratorium on major new construction or modification of stationary sources. We vacate that portion of EPA's order impermis-

sibly lifting the moratorium and remand for entry of a revised order consistent with our opinion in *Connecticut Fund for the Environment, Inc. v. EPA*, 672 F.2d 998 (2d Cir. 1982).

### I.

The Clean Air Act, 42 U.S.C. §§ 7401–7642 (Supp. III 1979),[1] establishes a complex federal-state relationship to control air pollution. Pursuant to the Clean Air Act Amendments of 1970, Pub.L.No.91–604, 84 Stat. 1676, EPA promulgated national primary ambient air quality standards (NAAQSs) as pollution limits necessary "to protect the public health." § 7409(b)(1). The states submitted SIPs designed to attain these standards by the statutory deadline of mid-1975, unless extended to 1977. *See generally Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 63–67, 95 S.Ct. 1470, 1474, 1476, 43 L.Ed.2d 731 (1975); *Union Electric Co. v. EPA*, 427 U.S. 246, 249–51, 96 S.Ct. 2518, 2522–2523, 49 L.Ed.2d 474 (1976). The states revised their SIPs to include transportation control strategies where other measures would not by themselves ensure attainment. *See* § 7410(a)(2)(B); *Natural Resources Defense Council, Inc. v. EPA*, 475 F.2d 968 (D.C.Cir. 1973).

When it became apparent that many states would fail to meet the statutory deadline, Congress passed the Clean Air Act Amendments of 1977, Pub.L.No.95–95, 91 Stat. 685. Pursuant to the 1977 Amendments, the states identified areas not meeting the NAAQSs and EPA designated these areas as "nonattainment" for each NAAQS that was violated. §§ 7407(d), 7501(2); 43 Fed.Reg. 8962 (Mar. 3, 1978). In return for extending the deadlines for attainment and for avoiding potential bans on sources of pollution in excessively polluted areas, these states were required to submit SIP revisions satisfying the stringent requirements added as Part D of Title I of the Clean Air Act by the 1977 Amendments. §§ 7501–7508. Under Part D, the revised SIP had to provide for attainment "as expeditiously as practicable" but no later than December 31, 1982, § 7502(a), and had to comply with other statutory requirements that Congress imposed to ensure attainment by the new deadlines. States that did not have an adequate Part D submission in force by July 1, 1979, were subject to a moratorium in any nonattainment area on major new source construction or modification that would contribute to concentrations of pollution for which an area had been designated nonattainment. §§ 7410(a)(2)(I), 7502(a)(1). *See generally Connecticut Fund for the Environment, Inc. v. EPA, supra.* In the case of areas that were nonattainment for carbon monoxide or ozone, additional extensions for attainment until December 31, 1987 were granted if earlier attainment was not possible. § 7502(a)(2). States receiving this additional extension included in their Part D submissions plans meeting the special additional requirements of § 7502(b)(11). These "extension states" are also required to submit additional SIP revisions by July 1, 1982, that contain further enforceable measures to ensure attainment by December 31, 1987. §§ 7502 note, 7502(c).[2]

---

1. Reference to provisions of the Clean Air Act will henceforth be made only to the appropriate section number of 42 U.S.C. (Supp.III 1979).

2. Section 7502(c) requires

   In the case of a State plan revision required under the Clean Air Act Amendments of 1977 to be submitted before July 1, 1982, ... effective on such date such plan shall contain enforceable measures to assure attainment of the applicable standard not later than December 31, 1987.

   Section 7502 note requires

   In the case of any State for which a plan revision adopted and submitted before such date has made the demonstration ... respecting impossibility of attainment before 1983 ... such State shall adopt and submit to the Administrator a plan revision before July 1, 1982, which meets the requirements of [§ 7502(b) and (c) ].

   EPA has interpreted these provisions as requiring only the submission of SIP revisions by extension states by July 1, 1982, and not requiring the revisions to have been approved and in place in the state's SIP by that date. 44 Fed. Reg. 20,372, 20,376 (Apr. 4, 1979). In light of the statutory ambiguity and by analogy to § 7410(a)(2)'s requirement of EPA plan approval or disapproval within four months of

The 1977 Amendments added two provisions to the Clean Air Act regarding transportation-related strategies that are the focal point of dispute in this case. For the first time, Congress explicitly recognized the need to improve public transportation systems if other strategies, such as transportation control measures designed to discourage or restrict motor vehicle use, are to be fully effective in reducing pollution.[3] Some transportation controls "may be practical only when adequate public transportation alternatives [are] available to meet basic transportation needs." H.Rep.No.95–294, 95th Cong., 1st Sess. 229 (1977).

The first pertinent statutory provision is the Moynihan-Holtzman Amendment, § 7410(c)(5), which permits a state upon application of its Governor to eliminate a strategy in a SIP requiring the imposition of an intra-city bridge toll, § 7410(c)(5)(A), if the SIP is revised to include

not later than one year after August 7, 1977 ... comprehensive measures (including the written evidence required by Part D), to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds .... Such measures shall, as a substitute for the tolls or charges eliminated ..., provide for emissions reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

§ 7410(c)(5)(B). The revisions "shall be submitted in coordination with any plan revision required under Part D" of the Clean Air Act. § 7410(c)(5)(C).

The second relevant provision is § 7410(a)(3)(D), sometimes called the "missing" Part D requirement because it was inadvertently omitted from Part D as originally enacted. When it was added four months later as one of several technical and conforming amendments enacted as § 14 of the Safe Drinking Water Amendments of 1977, Pub.L.No.95–190, 91 Stat. 1393 (Nov. 16, 1977), it was inserted into § 7410 rather than Part D. This provision requires states that obtained extensions for carbon monoxide or ozone attainment beyond 1982 under § 7502(a)(2) to revise their plans "to include the comprehensive measures and requirements" of § 7410(c)(5)(B). The provision was added "to require cities with severe [ozone and carbon monoxide] problems to use transit funds available to them to help them alleviate air pollution problems." 123 Cong. Rec.H 11,956–57, S18,372–73 (Dailey Ed. Nov. 1, 1977). Even in a statutory scheme as complex as the Clean Air Act, it is curious that the transportation improvement and control provisions were not included in Part D, but instead were hidden in §§ 7410(a)(3)(D) and 7410(c)(5)(B). And, as one knowledgeable commentator has observed, "Upon reading the two provisions, one almost wishes that they had remained hidden." Currie, *Relaxation of Implementation Plans Under the 1977 Clean Air Act Amendments,* 78 Mich.L.Rev. 155, 190 (1979).

---

submission, we find it plain in any event that EPA is required to approve or disapprove the July 1, 1982, submission within four months of its receipt (November 1, 1982, for timely submitted plans). After six months (January 1, 1983) if a plan has still not been approved, a duty on the part of EPA to promulgate acceptable regulations may arise under § 7410(c)(1) and a duty to reinstitute the moratorium on major new construction (if previously lifted) may arise under § 7410(a)(2)(I).

**3.** "Transportation control measures" are strategies designed to reduce pollution by limiting or controlling motor vehicle use. "Public transit improvement measures" are strategies for the improvement or expansion of mass transit systems. Public transportation improvement indirectly facilitates a reduction in motor vehicle usage and its associated pollutant effect. Even prior to the 1977 Amendments, some states, including New York, chose to adopt mass transit-related strategies as part of their SIP. *See* 46 Fed.Reg. 44,979, 44,982 (Sept. 9, 1981).

## II.

New York's experience with the transportation-related requirements of the Clean Air Act dates back to 1973 when EPA approved a revision to New York's SIP that added transportation control measures to New York's plan for reduction of carbon monoxide and ozone pollution levels in the New York City metropolitan area. 38 Fed. Reg. 16,550, 16,560 (June 22, 1973). The revisions (chosen by New York) provided for transportation control strategies including one that would impose tolls on the previously toll-free bridges over the East and Harlem Rivers. We upheld in large part EPA's approval of the revisions in *Friends of the Earth v. USEPA*, 499 F.2d 1118 (2d Cir. 1974), but declined to enforce the SIP because Congress required that suits seeking judicial enforcement of implementation plans be instituted in a district court where a factual record can be developed. Thereafter, when some of the transportation control strategies including the bridge toll strategy remained unimplemented and a citizen suit was brought in the district court, we affirmed a court order requiring the implementation and enforcement of the bridge toll strategy and other still unimplemented strategies in New York's SIP. *See Friends of the Earth v. Carey*, 552 F.2d 25 (2d Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *Friends of the Earth v. Carey*, 535 F.2d 165 (2d Cir. 1976).

After the 1977 Amendments to the Clean Air Act were signed into law and a modification of the court order was obtained, EPA approved New York's application under the Moynihan-Holtzman Amendment to eliminate the bridge toll strategy. 42 Fed.Reg. 61,453 (Dec. 5, 1977). In August, 1978, New York submitted its plan to satisfy that section's requirements for the improvement of public transportation and the implementation of additional transportation control measures. EPA expressed dissatisfaction with New York's proposed plan at 44 Fed. Reg. 5693 (Jan. 29, 1979). Meanwhile, on March 3, 1978, EPA designated the entire New York City metropolitan area as nonattainment for ozone and portions as nonattainment for carbon monoxide.[4] 43 Fed. Reg. 8962, 9018–19 (Mar. 3, 1978). Since New York requested an extension under § 7502(a)(2) until 1987 for carbon monoxide and ozone attainment, New York became doubly subject to the requirements of § 7410(c)(5)—both under the Moynihan-Holtzman Amendment, § 7410(c)(5)(B), as a state opting to replace an intra-city bridge toll strategy and under the missing Part D requirement, § 7410(a)(3)(D), as an extension state permitted to attain the carbon monoxide and ozone NAAQSs after 1982. On May 24, 1979, New York submitted its Part D SIP revisions, which included a revised plan for public transit improvement; the revision was accompanied by a document entitled "New York State Air Quality Implementation Plan, the Moynihan/Holtzman Amendment Submission: Transit Improvements in the New York City Metropolitan Area," which, as its title suggests, deals more specifically with the mass transit-related portions of New York's SIP.

New York's plan proposes improvements in the management of the transit system, rehabilitation of parts of the system, promotion of fare stability, improvement of transit support systems, and promotion of mass transit services. The plan includes more than 40 transit improvement projects.[5] Levels of funding and expected sources of funding at those levels are specified. The plan identifies five criteria for defining the "basic transportation needs" that are the focus of the Moynihan-Holtzman Amendment—(1) fare stability; (2) operational safety and reliability; (3) comfort; (4) environment and security; and (5) availability and convenience of service—and concludes that the selected improvements and levels of funding will meet these basic

---

4. The New York City metropolitan area consists of the five boroughs of New York City plus the counties of Nassau, Suffolk, Westchester, and Rockland. 45 Fed.Reg. 43,794, 43,794 (June 30, 1980).

5. The specific projects are listed in Addendums B and C at 45 Fed.Reg. 43,794, 43,808–09 (June 30, 1980).

transportation needs. The plan envisions an average annual expenditure on capital project improvements to meet basic transportation needs of $427 million. The plan estimates that its fare stability component alone would cause a reduction of at least 0.4% in total vehicle miles traveled (VMT) in the region, which would cause an equivalent reduction in pollution to that anticipated had the bridge toll strategy been implemented. The fare stability component requires that the fare be maintained at its then current level (50 cents) through 1981 and thereafter be increased at a rate less than the increase in the cost of living.

In May 1980, EPA conditionally approved [6] all elements of New York's Part D revisions for ozone and carbon monoxide except those relating to public transportation improvement (on which no action was taken). Among the proposals conditionally approved were New York's transportation control strategies designed to meet the requirements of § 7410(c)(5)(B)(ii) and the corresponding transportation control requirements of § 7410(a)(3)(D). 45 Fed.Reg. 33,981 (May 21, 1980). Then on June 30, 1980, nearly two years after the date by which Congress specified that the transit improvement provisions were to be contained in New York's SIP, EPA proposed to disapprove the public transit elements of New York's plan. 45 Fed.Reg. 43,794 (June 30, 1980). Specifically, EPA proposed to find that (1) the level of expenditures on mass transportation improvement to which New York was committed was less extensive than necessary to meet the area's basic transportation needs; (2) the plan lacked sufficient implementing schedules and details by which progress toward meeting basic transportation needs could be measured; (3) the state and responsible local agencies had not adopted the necessary requirements in legally enforceable form for the implementation of some mass transit improvements; (4) the plan did not identify sufficient sources of funding to cover program expenses; and (5) the plan was adopted

without the required consultation with local government bodies since it had not been endorsed by the Metropolitan Transportation Agency (MTA) and the Tri-State Regional Planning Commission. EPA did propose to find adequate and therefore approve New York's demonstration of an equivalent reduction in pollution from the fare stabilization strategy to that expected from the abandoned bridge toll strategy, but cautioned that this conclusion would have to be reassessed in light of proposed fare increases in contravention of the plan's provision for maintenance of the 50-cent fare through 1981. 45 Fed.Reg. at 43,803.

During the subsequent notice and comment period, New York submitted extensive objections to EPA's proposed findings. In particular, New York complained that EPA had judged New York's plan against EPA's unannounced definition of "basic transportation needs" and that EPA should have accorded New York a greater role in determining its own transit needs and deciding how to meet them. New York also objected to the requirement of more extensive implementing details and schedules for the identified transit improvements. New York noted that EPA was permitting other states to meet the requirements of § 7410(a)(3)(D) in a two-phase planning process under which a state could submit more general commitments to improve mass transit in 1979 to be followed by more detailed implementing timetables and schedules in a second submittal due by July 1, 1982. EPA and the Department of Transportation (DOT) then jointly announced a proposed federal policy on meeting the "basic transportation needs" requirement of both the Moynihan-Holtzman Amendment and the missing Part D provision. 45 Fed. Reg. 62,170 (Sept. 18, 1980). Under EPA's proposed policy, basic transportation needs would be "defined locally in recognition of the wide diversity of transportation needs and pollution problems across th[e] country" and would require the "development of

---

**6.** We recently upheld EPA's conditional approval technique except insofar as it permitted the moratorium of § 7410(a)(2)(I) to be lifted prior to full compliance with the requirements of Part D. *See generally Connecticut Fund for the Environment, Inc. v. EPA, supra.*

transit and paratransit measures that are necessary to maintain mobility where transportation control strategies are implemented." 45 Fed.Reg. at 62,171. EPA specified a series of factors to be considered in the development of measures to meet basic transportation needs and listed other requirements regarding the implementation and funding of these measures. *Ibid.* In light of the new proposed federal policy on meeting basic transportation needs, EPA then reopened the comment period on its notice of proposed disapproval of the mass transit portions of New York's SIP so as to permit exploration of "whether alternative actions such as conditional approval . . . may be appropriate." 45 Fed.Reg. 62172, 62,172 (Sept. 18, 1980).

Nearly one year later (more than three years after the August 1978 statutory deadline for SIP revision) and after the institution of a district court suit seeking, among other things, to compel EPA to act on New York's plan,[7] EPA gave its final approval to the mass transit elements of New York's plan. 46 Fed.Reg. 44,979 (Sept. 9, 1981). EPA agreed with New York that "the State should have ultimate responsibility for identifying its transit needs and deciding how to meet them" and accepted New York's definition of basic transportation needs as "consistent with EPA policy." *Id.* at 44,980. EPA determined that New York, like other extension states required to develop transit improvement plans under § 7410(a)(3)(D), should be permitted to identify improvements with greater specificity and provide implementing schedules and timetables in New York's July 1, 1982, submittal.[8] Therefore EPA approved the plan even though some identified measures lacked detailed implementing provisions and schedules in enforceable form, omissions to be supplied by July 1, 1982. EPA also based its decision to approve the plan on new information regarding the availability of funding and

the support of local agencies for the plan. As for the equivalent pollution reduction requirement of the Moynihan-Holtzman Amendment, which EPA had previously proposed to approve on the basis of the pollution reduction to be achieved by the fare stabilization strategy, EPA noted that the fare stabilization objective of maintaining the 50-cent fare through 1981 had not been met because of fare increases in July 1980 and July 1981. EPA therefore required New York to submit reports on the air quality impact of the fare increases and stated that it would take appropriate corrective action, if necessary, after evaluating the state's reports. *Id.* at 44,981. EPA's approval of the public transportation plan was "taken with the under standing [*sic*] that, as required by [the Clean Air Act], on or before July 1, 1982 the SIP for the New York City metropolitan area will be revised to demonstrate that the provisions of the [Moynihan-Holtzman Amendment] are being met." *Ibid.*

### III.

■ In challenging EPA's approval, petitioners first contend that the Administrator's decision to approve New York's plan after issuing a prior notice of proposed disapproval constitutes administrative inconsistency requiring remedial action by a reviewing court. We disagree. An agency's proposed action is just that and does not bind the agency to follow its initial proposal. The agency is obliged to take into account the comments it receives and entitled to adopt a substantially different rule. *American Iron & Steel Institute v. EPA,* 568 F.2d 284, 293 (3d Cir. 1977). To hold otherwise would be contrary to the purpose of the notice and comment period, which is to permit the agency to learn from the comments and tailor its actions as appropri-

---

**7.** In a companion case we today affirm the dismissal of the district court case. *Council of Commuter Organizations v. MTA,* 683 F.2d 663 (2d Cir. 1982).

**8.** EPA guidance material permits extension states, subject to § 7410(c)(5)'s requirements

through the missing Part D requirement, to adopt a two-phase planning process with the state committing itself to submit additional implementing details by July 1, 1982. 43 Fed.Reg. 21,673, 21,676–77 (May 19, 1978).

ate.[9]   *Cf. International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 n.51 (D.C. Cir.1973).   Here EPA has fully complied with the rules of the Administrative Procedure Act in approving New York's plan.   It presented an adequate statement of the agency's basis and purpose for issuing its final rule as required by 5 U.S.C. § 553(c) (1976).   And EPA's prior notice of proposed disapproval, 45 Fed.Reg. 43,794 (June 30, 1980), and its reopening of the comment period to permit exploration of "whether alternative actions such as conditional approval . . . may be appropriate," 45 Fed. Reg. 62,172, 62,172 (Sept. 18, 1980), fairly apprised interested parties of the issues before the agency so as to satisfy the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553 (1976). *See American Iron & Steel Institute v. EPA, supra*, 568 F.2d at 293.   We therefore turn to a consideration of the merits of EPA's approval of New York's mass transportation improvement program.

A.   *Expansion or Improvement of Public Transportation Measures to Meet Basic Transportation Needs*

■   Petitioners first contend that New York has not satisfied the requirement of § 7410(c)(5)(B)(i) to

establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable.

Petitioners argue that the Administrator has abdicated her responsibility under the Clean Air Act by deferring to New York's plan without making an independent determination as to whether New York's plan

meets the metropolitan area's basic transportation needs consistently with the requirements of federal law.   If petitioners were correct that EPA has given New York unfettered discretion to define its own basic transportation needs and then to select the measures to meet those needs without an independent determination as to the adequacy of those decisions under federal law, we would agree that EPA acted contrary to the law.   But, although EPA did not make its policy crystal clear, we understand EPA's policy that "the State should have the ultimate responsibility for identifying its transit needs and deciding how to meet them," [10] 46 Fed.Reg. at 44,980, not to be a policy of absolute deference but simply as another application of the normal rule under the Clean Air Act that the states have primary responsibility for assuring air quality.   §§ 7401(a)(3), 7407(a);  *See Train v. Natural Resources Defense Council, Inc., supra*, 421 U.S. at 64, 95 S.Ct. at 1474.   Accordingly, EPA did not automatically defer to New York's plan for meeting its basic transportation needs, but approved it only after finding it to be "consistent with EPA policy," 46 Fed.Reg. at 44,980, as announced in the joint EPA–DOT proposed federal policy on meeting basic transportation needs and other guidance material.   That policy is not one of unfettered discretion of the states but rather expressly requires the states to develop "transit and paratransit measures that are necessary to maintain mobility where transportation control strategies are implemented," 45 Fed.Reg. at 62,171, and outlines specific requirements regarding the development of measures to meet basic transportation needs.[11]

---

**9.**  The notice and comment period here enabled EPA to determine that local agencies did support New York's plan and that the plan had adequate funding support.   New York State's comments also helped precipitate the joint EPA/DOT definition of basic transportation needs that was unavailable at the time of the proposed disapproval.

**10.**  *See also* 45 Fed.Reg. at 62,171 ("it is the intent of this policy that . . . basic transportation needs be defined locally in recognition of the wide diversity of transportation needs and pollution problems across th[e] country . . . .").

**11.**  EPA's analysis in its notice of final approval, 46 Fed.Reg. at 44,979, of whether New York's plan complies with EPA's construction of § 7410(c)(5)(B)(i) can be charitably characterized as thin, at least if that document is viewed in isolation.   There is little if any analysis evaluating the specific measures in New York's plan against the statutory requirement.   But in light of the extensive analysis in EPA's prior proposed disapproval, the basis of the Adminis-

Petitioners next suggest that New York's plan lacks sufficient details for the implementation of identified transit improvement measures by which progress toward meeting basic transportation needs can be monitored. They contend that § 7410(c)(5)(B)(i) requires New York to provide complete implementing details according to specified timetables for all identified measures. EPA contends that the plan contains a sufficient level of implementing detail and schedules and that the statutory scheme contemplates that these details may be accompanied by a commitment to supply the remaining details and timetables in New York's July 1, 1982, submittal.

■ We have in the past upheld EPA's construction of certain provisions of the Clean Air Act as permitting EPA to approve state plan provisions that offer only a generalized commitment with a minimal level of implementing detail when coupled with a promise to submit more specific implementing regulations and schedules in the future. *See Friends of the Earth v. USEPA, supra,* 499 F.2d at 1124 (upholding EPA's approval of New York's plan for reducing parking in Manhattan based upon New York's commitment to adopt specific implementing regulations to fill in the details). However, not all statutory requirements are susceptible to *Friends of the Earth* analysis. Often Congress requires immediately available implementing details prior to final approval by EPA. *See Connecticut Fund for the Environment, Inc. v. EPA, supra,* 672 F.2d at 1009 n.25 (various Part D requirements such as an inventory of sources of emissions require specific implementing details at the time of final unqualified approval). Determining whether a particular provision is susceptible to *Friends of the Earth* analysis is basically a

problem of statutory construction. In order to qualify for such treatment, the delay in providing implementing details and schedules must be consistent with the requirements of the particular statutory provision as well as more general statutory requirements, including attainment by the statutory deadline and reasonable further progress toward attainment. *Id.* at 1009 n.23. Finally, there must always be sufficient commitment and detail to permit "the EPA or a private citizen ... in an appropriate enforcement action" to compel the implementation of the plan strategy. *Friends of the Earth v. USEPA, supra,* 499 F.2d at 1124.

As a starting point, we believe that § 7410(c)(5)(B)(i) must be construed as requiring the provision of *some* implementing details and schedules prior to final approval. The circumstances of the passage of the Moynihan-Holtzman Amendment make clear that Congress contemplated that there be some *real improvement* in transit service and facilities at the latest by 1979 (and continuing thereafter) in return for the elimination of the bridge toll strategy. The Amendment, which was proposed by New York legislators in the Senate and House after the Act had already been reported out of committee, was specifically designed to provide a substitute for the court-ordered enforcement of the bridge toll strategy. Its manifest purpose was to ensure that mass transit improvements and new transportation control measures would compensate for the emission reductions and generation of funds for mass transit that the toll strategy was intended to produce.[12] Since the bridge toll strategy would have had such beneficial effects immediately upon its implementation in 1977 or 1978, it is clear that Congress intended that there be a real improvement in public transportation meas-

---

trator's decision to approve the plan is reasonably clear. A remand for further explanation, *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), is therefore unnecessary.

**12.** An October 1976 report by the State Department of Transportation indicated that the bridge toll strategy would net on the order of $141 million annually for transit subsidies.

This amount was significant since at the time each of the federal and state transit subsidies was less than that amount. The same report indicated that the bridge toll strategy would result in a reduction in pollution because of the deterrent effect on travel into Manhattan and the elimination of circuitous journeys to avoid existing toll bridges.

ures by no later than 1979.[13] As Senator Javits described the requirements of the Moynihan-Holtzman Amendment:

> The revision, which must be made within 1 year after enactment, must include comprehensive measures to establish, improve, or expand public transportation to meet basic transportation needs ... Thus, elimination of the toll strategy must be accompanied by measures that adequately make up for both the clean air aspects of the bridge toll requirement as well as the mass transit benefits expected from the bridge toll revenues. The elimination of the toll requirement will not sacrifice any of New York's clean air goals, because the amendment expressly requires that new measures be included to compensate for any emissions reductions that would have been achieved by the bridge tolls.

123 Cong.Rec. S9231 (June 9, 1977).

However, here New York's submission does contain implementing details and schedules for many identified strategies.[14] The question before us is not whether EPA may construe the Amendment as permitting the postponement of *all* implementing details and timetables but whether EPA can permit New York to postpone supplying *some* implementing detail until July 1, 1982 by permitting it to use a two-phase approach.[15] And, in determining the permissibility of a two-phase approach, we are reminded that where different interpretations of a statute are reasonable and consistent with the Act, we are required to defer to the Administrator's interpretation of the statute she administers, rather than substitute our interpretation for that of the agency. *Train v. Natural Resources Defense Council, Inc., supra,* 421 U.S. at 75, 95 S.Ct. at 1479; *Connecticut Fund for the Environment, Inc. v. EPA, supra,* 672 F.2d at 1006, 1007; *Lead Industries Ass'n v. EPA,* 647 F.2d 1130, 1147 (D.C.Cir.1980); *Friends of the Earth v. USEPA, supra,* 499 F.2d at 1124. In this case we cannot say that EPA's interpretation of § 7410(c)(5)(B)(i) to permit a two-phase approach for the provision of implementing detail and schedules for identified improvement measures is either unreasonable or contrary to the statute.

To begin with, the imprecision of the "basic transportation needs" standard and the statutory language requiring New York to "expand" or "improve" public transportation militates in favor of the more flexible two-phase approach rather than the stringent one-step approach urged by petitioners. The relatively vague language does not evince any Congressional intent to

---

**13.** The express language of the statute requires that SIPs "shall ... be revised" to include comprehensive measures "not later than one year after August 7, 1977." Although this language has been construed not to require that the final plans be fully approved and in place by August 7, 1978, if the state was to avoid the bridge toll strategy, *see New England Legal Foundation v. Costle,* 475 F.Supp. 425, 434 (D.Conn.1979) (EPA may take action on Moynihan-Holtzman submittals in 1979 in conjunction with review of Part D submittals), *aff'd,* 632 F.2d 936 (2d Cir. 1980), *and* 666 F.2d 30 (2d Cir. 1981), it is clear that Congress contemplated that the approval process would be complete at the very latest by the end of 1979 and that the measures would therefore be in full force and effect by that date.

**14.** New York's SIP adopts the implementation schedules contained in the area's Transit Improvement Program. In its original notice of disapproval EPA found that these timetables met the requirement for schedules for implementation of transit improvements. 45 Fed. Reg. at 43,806.

**15.** We are in some doubt as to whether the plan (with its limited implementing detail and schedules) provides for a sufficient real improvement in mass transportation prior to July 1, 1982. We note that the record indicates that there was a significant increase in spending over past levels during these years. But on the other hand petitioners have painted a picture of abysmal conditions on the mass transit system, and there are indications in the record that ridership has been decreasing, a trend clearly contrary to the intent of the Moynihan-Holtzman Amendment. Although we are not finding the plan deficient for the years prior to the 1982 submittal, which are in any event past history at this point, we fully expect EPA to make specific findings regarding whether New York's 1982 submittal provides for a real improvement in mass transit services for 1982 and each year thereafter when EPA considers that submittal.

require that all implementing details of a plan be available prior to final EPA approval.[16] Quite to the contrary, the statute's requirement of "comprehensive measures" contrasts with other requirements in the Clean Air Act for "enforceable measures," e.g., § 7502(c), which suggest a requirement of a greater degree of immediately available implementing detail and timetables. In addition, § 7410(c)(5)(C) supports EPA's conclusion that Congress did not rule out a two-phase approach. That section requires that the mass transportation revisions "shall be submitted in coordination with any plan revision required under Part D." Under Part D, extension states like New York must submit a second plan revision by July 1, 1982, containing in enforceable form additional measures needed to ensure attainment by 1987. The two-stage submittal thus facilitates coordination of the transportation improvement and Part D revision processes by permitting a state like New York, which is subject to the transportation requirements both directly under § 7410(c)(5) and under the missing Part D requirement, § 7410(a)(3)(D), to adopt a coordinated two-phase approach to the planning and scheduling of its mass transit improvements and of other strategies to meet Part D requirements. In fact, the legislative history indicates that Congress envisioned that the second plan submittal by extension states would provide those states with additional time to develop and phase in transportation improvements including improvements to public transit systems. S.Rep.No.95–127, 95th Cong., 1st Sess. 39–40 (1977). Finally, and most importantly, EPA's construction makes sense from a planning perspective. The two-phase planning process allows the state to conduct an ongoing comprehensive review of its transit system and to take into account recent experience in the second submission. We con-clude that affording New York until July 1, 1982, to supply some implementing detail and schedules is consistent with §§ 7410(c)(5)(B)(i) and (a)(3)(D).

We find no reason to believe that waiting until July 1, 1982, for such detail will preclude New York from attaining the carbon monoxide or ozone NAAQSs by 1987 or from meeting any other requirement of the Clean Air Act. We recognize that absence of implementing detail will narrow the scope of enforcement of existing SIP requirements in a suit by EPA or a private citizen. It will be difficult to prove violations of requirements expressed in general terms. But the existing SIP requirements are not so devoid of content as to preclude enforcement, and suit in the district court will be available to compel submission of implementing details withheld for an unreasonable period of time. We conclude that EPA's construction of the statute to permit a delay in the submission of some implementing detail and timetables is within its administrative discretion in interpreting the statute it administers.

B. *The Equivalent Emission Reduction Requirement*

We are troubled by EPA's approval of New York's plan for meeting § 7410(c)(5)(B)'s requirement of a demonstration that the transit improvement measures

> shall, as a substitute for the tolls or charges eliminated ..., provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

New York proposed to meet this requirement as follows:

> There is a considerable amount of past experience in this region and other parts

---

**16.** Imprecise language by itself does not automatically sustain a *Friends of the Earth*-style analysis of a statutory provision. The legislative history of the provision, or the role the provision plays in the broader statutory scheme, may evince a contrary congressional intent. As we have already noted, the language of § 7410(c)(5)(B)(i) could not be con-strued as permitting the postponement of the provision of *all* details of a plan until July 1, 1982. Neither do we believe that the section permits the postponement of the submittal of any plan details beyond final approval of the July 1, 1982, submission, though we recognize that those very plan details will contemplate action to be taken after final approval.

of the country that documents the relationship of transit fare and service levels with transit ridership and to a lesser degree auto use. Based on this experience the State estimates that the SIP policy to hold the 50¢ transit fare through 1981 will yield a 1% reduction in regional VMT over the past trends .... The SIP's hold-the-fare commitment runs through 1981. Beyond 1981 if the fare is held at ½ the rate of inflation through 1987, a similar 1% VMT reduction could be achieved .... While most service improvements are subject to further study ... these potential improvements ... if feasible and funded have a potential for about a 0.5% VMT reduction.

.    .    .    .    .

In summary, the analysis indicates that over the long term any one measure[,] portion of some, or some combination of portions of these measures will achieve a reduction in auto use and HC emissions from projected trends, equal to the small (0.4%) regionwide VMT and HC emissions reduction anticipated from bridge tolls %y(4)(27) For the immediate future the State is relying primarily on the fare stabilization component of the plan since:
1. This measure is already in effect while service improvements require feasibility studies and capital improvements have a considerable lead time [prior] to implementation.
2. Data on the public response to fare improvements is much better than for service improvements.

EPA proposed to approve this portion of New York's plan in its original notice of

disapproval, but cautioned that its conclusion would have to be reassessed in light of then proposed fare increases. 45 Fed.Reg. at 43,803. Thereafter, the fare was increased from 50 cents to 60 cents in July 1980 and then to 75 cents in July 1981 in contravention of the plan's provision for maintenance of the 50-cent fare through 1981.[17] In its final approval in September 1981, EPA did not further discuss the equivalent reduction requirement,[18] but did note that New York had submitted a report on the effect of the 1980 increase and that EPA was expecting a similar report on the effects of the 1981 increase.[19] 46 Fed.Reg. at 44,981.

Ordinarily we would be unable to uphold EPA's reliance on a strategy in a SIP to satisfy a statutory requirement when developments subsequent to proposal of the strategy indicate that the strategy will not be carried out by the state. EPA should have considered disapproving New York's plan for compliance with the emission reduction requirement when it became apparent that New York's reliance on the fare stabilization strategy to achieve the reduction was illusory. *See Friends of the Earth v. Carey, supra,* 552 F.2d at 35. A fare stabilization strategy that had already been violated prior to final approval cannot serve as the measure required by the Moynihan-Holtzman Amendment to satisfy the equivalent reduction requirement. However, here New York's plan as set out above is somewhat ambiguous as to whether strategies other than fare stabilization would alternatively satisfy the equivalent reduction requirement. Ideally EPA should have

17. In a companion case decided today, *Council of Commuter Organizations v. MTA,* 683 F.2d 663 (2d Cir. 1982), we affirm the dismissal of a challenge to these fare increases as violations of New York's SIP since the increases were not part of an approved plan until September 1981 and plaintiffs did not give the required 60 days' notice of an alleged violation of the plan after its approval.

18. The unconditional final approval impliedly approved the satisfaction of this requirement in accord with EPA's prior proposed approval.

19. Because of the potential pollution-increasing effects of these fare increases, these reports

were necessary not only to monitor compliance with the transportation-related requirements of the Clean Air Act, but also to permit the EPA to determine whether the fare increases made New York's SIP inadequate to achieve attainment of the carbon monoxide and ozone NAAQSs by the statutory deadline. If the increase in pollution made the other measures in New York's SIP inadequate because of the unplanned for increase in pollution from additional motor vehicle use, New York (or EPA) would have to revise the SIP to make up for the deficiency. §§ 7410(a)(2)(H), 7140(c)(1)(C).

made a determination as to the adequacy of the alternative measures. But at this late date, with New York's impending July 1, 1982 submittal certain to deal with this issue, a remand for resolution of this question would be duplicative. Accordingly, we think it best to permit EPA to "kill both birds with a single administrative stone," *Manchester Environmental Coalition v. EPA*, 612 F.2d 56, 61 (2d Cir. 1979), when it reviews the July 1, 1982, submittal. If it turns out that New York's plan did not satisfy the equivalent reduction requirement for the years prior to 1982 (in violation of the statutory requirement), we leave it to EPA to determine in the first instance whether New York would have to compensate for this failure by providing for additional post-1982 reductions in emissions.

### C. Timeliness of EPA's Approval

■ We have been unable to locate any statutory authority for EPA's delay in approving New York's plan for mass transit improvement for more than three years after the date by which § 7410(c)(5)(B) required New York's SIP to be revised to include comprehensive measures to improve public transportation if a state was to avoid the implementation of its originally proposed bridge toll strategy. The deleterious effects of this unprecedented delay, which is contrary to Congress' intent if not to the express language of the statute, are particularly severe. First, the delay has enabled New York to avoid any commitment to implement the bridge tolls or any substitute measure from August 1978 until September 1981. Because New York's plan was in "administrative purgatory"[20] for over three years, there could be no enforcement of the provisions of New York's proposed plan. Accordingly, in the companion case we decide today, *Council of Commuter Organizations v. MTA*, 683 F.2d 663 (2d Cir. 1982), a citizen suit to prevent a violation of the

plan's fare stabilization strategy had to be dismissed as premature since the plan had still not been given EPA approval. Second, the delay has nullified the effectiveness of our review of EPA's approval at this late date. Whether or not we grant the petition for review, the effect is the same: New York must submit additional implementing details for its transportation improvement measures in its July 1, 1982 submittal. If we were to determine that the statute required immediately available implementing details to have been submitted in 1979, there would be little we could do at this point to effectuate the statutory scheme retroactively. We could only require New York (or perhaps EPA) to provide additional implementing details in 1982, which is the same result achieved under the agency action we are approving.

By permitting such a blatant departure from the time frame specified by Congress, EPA has impermissibly rewritten the time-specific provisions of the legislation, arrogating to itself a legislative role beyond its power as an administrative agency and frustrating the means for any effective judicial review of its action. If EPA finds that it has insufficient funds to take timely action to effectuate statutorily imposed deadlines for EPA action, additional funding should be requested from Congress. We therefore in no way condone the timing of EPA's tardy approval. Nonetheless, as a Court of Appeals our concern is "not how late EPA's action has occurred, but whether the substance of the action satisfies the substantive requirements of the" Clean Air Act. *Connecticut Fund for the Environment, Inc. v. EPA, supra*, 672 F.2d at 1011. Jurisdiction to enforce EPA's duty to act upon New York's submission rests with the district court under § 7604(a)(2). *See id.* at 1010.[21] Accordingly, the tardiness of EPA's

---

20. *Citizens for a Better Environment v. Costle*, 515 F.Supp. 264, 274 (N.D.Ill.1981).

21. That suit, filed in December 1980, was delayed by the recusal of the judge to whom it was initially assigned and thereafter by the

deficiency of the initial complaint, which was dismissed with leave to amend. Adjudication of the amended complaint was deferred at the request of the parties, including the plaintiffs, in light of anticipated action by EPA.

action does not require us to grant the petition for review.

## D. *Other Requirements*

■ We cannot say that EPA's evaluation of the adequacy of the funding provisions of New York's transit improvement program was arbitrary or capricious or an abuse of discretion, *See Friends of the Earth v. USEPA, supra,* 499 F.2d at 1123. Petitioners rely primarily on EPA's original proposed disapproval of the plan's compliance with statutory requirements regarding funding, §§ 7410(a)(2)(F), (c)(5)(B), and 7502(b)(7). However, EPA credited evidence submitted subsequent to the proposed disapproval, indicating a sufficient commitment for financing of the plan. 46 Fed. Reg. at 44,980–81. In fact, the state exceeded the capital funding levels for mass transportation projects in the plan in 1979 and 1980. Because EPA did not require New York to submit complete time-specific information on the funding for all years of the transit improvement program, *ibid.,* EPA must reevaluate the adequacy of the plan's funding provisions (especially in light of recent federal funding cutbacks in the area of mass transit aid), in assessing New York's July 1, 1982, submittal.

Neither can it be said that EPA erred in approving the plan's compliance with the requirement of evidence of consultation with local and regional agencies under §§ 7410(c)(5)(B), 7502(b)(9), and 7504. Subsequent to EPA's original proposed disapproval of New York's compliance with this requirement, MTA and the Tri-State Planning Commission announced their support of New York's plan. EPA did continue to express some concern about the degree of consultation with local entities regarding the scope of transit improvements and the implementation of specific projects. 46 Fed.Reg. at 44,980. But in concluding that

22. In its brief, EPA notes that New York has met all but one of the fourteen conditions to final approval. We have not been informed of any current compliance with the remaining condition.

23. The ban on construction may be lifted with regard to sources emitting only pollutants for

this concern did not warrant disapproval, EPA emphasized that local agencies would have another chance for participation through the development of the July 1, 1982, submittal. EPA will have an opportunity to evaluate the adequacy of this consultation when it reviews the 1982 plan.

## IV.

■ In the notice of final approval before us on this petition for review, EPA lifted the moratorium on major new construction or modification of stationary sources even though the non-mass transit portions of New York's plan had been previously given conditional rather than final approval. 46 Fed.Reg. at 44,981; 45 Fed. Reg. at 33,981. As we recently held in *Connecticut Fund for the Environment, Inc. v. EPA, supra,* Congress clearly specified that the moratorium on new construction in any nonattainment area could not be lifted until a SIP revision fully complies with Part D. §§ 7410(a)(2)(I), 7502(a). This requirement is not met until EPA finds a plan in final rather than conditional compliance with all the requirements of Part D.[22] Accordingly, we vacate that portion of EPA's order impermissibly lifting the moratorium and remand for entry of a revised order.[23]

### Conclusion

The petition for review is denied, except to the extent that EPA's order prematurely lifted the moratorium on major new construction or modification of stationary sources. That portion of the EPA's order is vacated and we remand for entry of a revised order consistent with our opinion in *Connecticut Fund for the Environment, Inc. v. EPA, supra.*

In assessing the adequacy of the July 1, 1982, submittal EPA should, among other things:

which New York is in attainment or for which New York has a fully approved Part D plan. *Connecticut Fund for the Environment, Inc. v. EPA, supra,* 672 F.2d at 1010.

(1) make an independent determination as to the adequacy of New York's definition of its basic transportation needs in accordance with EPA guidance material;

(2) determine whether the identified measures, as scheduled for implementation in the July 1, 1982, submittal, meet New York's basic transportation needs by providing for a real improvement in public transportation for 1982 and each year thereafter (this evaluation requires a detailed discussion of the identified improvement measures);

(3) evaluate the plan's provision of implementing details and schedules that are sufficiently specific to enable the monitoring of New York's progress toward meeting its basic transportation needs;

(4) ensure that the plan identifies responsible agencies required to take actions to implement identified strategies as scheduled, see 46 Fed.Reg. 7182, 7183 (Jan. 22, 1981); [24]

(5) determine whether the plan meets the equivalent reduction requirement and whether remedial action needs to be taken to remedy past failures to satisfy this requirement;

(6) reevaluate the adequacy of the plan's funding provisions in light of recent federal funding cutbacks and recent developments regarding state aid for mass transit; and

(7) assess the adequacy of consultation with local and regional agencies in the preparation of the 1982 plan.

We expect the EPA's consideration of these items to reflect a concern for the delay that has already ensued and not to be an occasion for even further delay beyond what is inevitably required by diligent agency consideration.

Petition denied except as indicated herein.

---

**24.** For instance, if New York continues to rely on a fare stabilization strategy, some agency or individual must take responsibility for ensuring that this strategy is implemented.