799 F.2d 879
 25 ERC 1006, 55 USLW 2166, 16 Envtl.
L. Rep. 20,927
 COUNCIL OF COMMUTER ORGANIZATIONS, Committee for Better
Transit, Inc., Barry Benepe, and Stephen B.
Dobrow; Action for Rational Transit, Petitioners,
v.
Lee M. THOMAS, Administrator, and the United States
Environmental Protection Agency, Respondents,
and
State of New York, Intervenor.
 No. 456, Docket 85-4128.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 19, 1985.
Decided Aug. 28, 1986.
 
 David R. Wooley, Asst. Atty. Gen., Albany, N.Y. (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Albany, N.Y., on brief), for intervenor.
 William Hoppen, New York City (David M. Corwin, New York City, on brief), for petitioners.
 Susan L. Smith, U.S. Dept. of Justice, Washington, D.C. (F. Henry Habicht II, Asst. Atty. Gen., U.S. Dept. of Justice, Washington, D.C., Mark Stanga, U.S. E.P.A., Washington, D.C., Francis S. Blake, Gen. Counsel, William F. Pederson, Assoc. Gen. Counsel, Peter H. Wyckoff, Asst. Gen. Counsel, U.S. E.P.A., Washington, D.C., Gary Cohen, New York City, on brief), for respondents.
 Before VAN GRAAFEILAND, NEWMAN, and MINER, Circuit Judges.
 JON O. NEWMAN, Circuit Judge:
 
 
 1
 In the aftermath of our decision in Council of Commuter Organizations v. Gorsuch, 683 F.2d 648 (2d Cir.1982) ("CCO I "), we return to the continuing efforts of commuter groups in the New York City metropolitan area to convert the national effort to combat air pollution into a local battle to improve mass transit. In CCO I, though the commuter groups lost that round of litigation against the United States Environmental Protection Agency (EPA), they secured some basis for believing that the next steps to be taken by the State of New York in complying with the requirements of the Clean Air Act, as amended, 42 U.S.C. Secs. 7401-7626 (1982 & Supp. II 1984), would not only make the air cleaner but would also make mass transit better. It now appears that such optimism, which we admit we shared, was not well founded. The reason for disappointment is that New York has changed its mind as to the mass transit steps it will commit itself to take in complying with the Act. Though the State is willing to improve mass transit and is spending increased amounts of money for this purpose, it has backed away from commitments that we and the plaintiffs expected to be detailed when New York submitted to EPA the 1982 revision of its State Implementation Plan (SIP). That 1982 revision was approved by EPA in a June 17, 1985, ruling, which is now challenged on this petition for review. For reasons that follow, we conclude, as did EPA, that the Act permits New York to change its mind and that the 1985 approval is not erroneous in any of the respects urged by the petitioning commuter groups. We therefore deny the petition for review.
 
 Background
 
 2
 Regrettably, the nature of the issue and the basis of our decision emerge only after detailed examination of the complex statutory and regulatory scheme and the history of New York's prior efforts to satisfy the Act's requirements. Perhaps one day Congress will try to remove the smog that obscures understanding of the Act, even as it legislates to clean the air. Until then, we must do the best we can with the materials at hand.
 
 
 3
 The statutory scheme and New York's prior efforts at compliance are outlined in detail in CCO I, 683 F.2d at 651-55, and will only be highlighted here. States are required to include in a SIP transportation control strategies where necessary to meet air quality standards promulgated by EPA. See Sec. 7410(a)(2)(B); Natural Resources Defense Council, Inc. v. EPA, 475 F.2d 968 (D.C.Cir.1973) (per curiam). In 1973 EPA approved an amendment to New York's SIP in which New York proposed, among other things, to curtail automobile use in New York City and thereby reduce air pollution by imposing tolls on the bridges over the East and Harlem Rivers. 38 Fed.Reg. 16,550, 16,560 (1973). In 1977 Congress amended the Act to permit states previously committed to bridge tolls as a means of curtailing air pollution to remove such tolls provided that, in return, the states would undertake new obligations. The nature of those new obligations is at the heart of the current dispute.
 
 
 4
 The toll-removal provision is contained in the Moynihan-Holtzman Amendment, section 7410(c)(5). States opting to remove tolls previously promised in a SIP are required to revise their SIPs not later than August 7, 1978, to include comprehensive measures to
 
 
 5
 (i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and
 
 
 6
 (ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards.
 
 
 7
 Sec. 7410(c)(5)(B). This subsection also specifies that such measures shall
 
 
 8
 provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.
 
 
 9
 Id. New York is subject to the requirements of section 7410(c)(5) not only because it opted to remove the bridge tolls but also because these same requirements apply, by virtue of the so-called "missing Part D," to areas like New York City that could not meet air quality standards for ozone and carbon monoxide by 1982 and requested an extension until 1987 to meet such standards. See Sec. 7410(a)(3)(D); CCO I, 683 F.2d at 652-53.
 
 
 10
 In 1979 New York, having elected to remove the bridge tolls, submitted to EPA a revision of its SIP to comply with the Moynihan-Holtzman Amendment. The 1979 submission included more than 40 transit improvement projects to satisfy the statutory requirement that a state must establish, expand, or improve transit "to meet basic transportation needs." New York identified five criteria for defining basic transportation needs: (1) fare stability, (2) operational safety and reliability, (3) comfort, (4) environment and security, and (5) availability and convenience of service. To achieve fare stability the State proposed to maintain the then current New York City transit fare of 50 cents through 1981 with increases thereafter to be less than increases in the cost of living. The State indicated that it would rely primarily on fair stabilization to satisfy the requirement of achieving emission reductions equivalent to what the bridge tolls would have achieved, but that a combination of the transportation measures it proposed could be expected to reduce emissions by at least as much as the 0.4 per cent reduction that would have been achieved by the bridge tolls.
 
 
 11
 On June 30, 1980, already two years after the date by which Congress specified that transportation measures complying with the Moynihan-Holtzman Amendment were to be included in New York's SIP, EPA proposed to disapprove the public transit elements of New York's 1979 submission. 45 Fed.Reg. 43,794 (1980). Among the reasons for disapproval was the lack of sufficient implementing schedules and details by which progress toward meeting "basic transportation needs" could be measured. EPA did propose to approve New York's demonstration that its fare stabilization policy would satisfy the equivalent emission reduction requirement but cautioned that this conclusion would have to be reassessed in light of the then pending proposal to increase the 50-cent fare. In the ensuing notice and comment period concerning EPA's proposed rejection of the 1979 submission, New York filed numerous objections to EPA's proposed findings. In particular, New York complained that EPA had judged New York's transit proposals against EPA's own undefined view of "basic transportation needs" instead of according the State an appropriate role in defining its own needs and determining how to meet them.
 
 
 12
 Perhaps in response to this criticism, EPA and the Department of Transportation jointly announced in the fall of 1980 a proposed federal policy on meeting the "basic transportation needs" requirement of the Moynihan-Holtzman Amendment. 45 Fed.Reg. 62,170 (1980).[1] The new policy made clear that "basic transportation needs" would be "defined locally in recognition of the wide diversity of transportation needs and pollution problems across this country." Id. at 62,171. More significantly, the new policy endeavored to give content to the phrase "basic transportation needs." Paragraph 1.1 provides:The basic transportation needs requirement calls for development of transit and para-tran[si]t measures that are necessary to maintain mobility where transportation control strategies are implemented.
 
 
 13
 Id.
 
 
 14
 Though the issuance of this new policy would become the focal point of the EPA ruling that is the subject of the pending petition for review, the new policy did not affect the course of EPA's further consideration of New York's 1979 SIP revision. That submission was ultimately given conditional approval by EPA in the fall of 1981, 46 Fed.Reg. 44,979 (1981). The approval noted the lack of detail concerning New York's transit improvement proposals and that fare increases had occurred in July 1980 and July 1981. EPA therefore conditioned its approval of the 1979 submission on New York's furnishing further details of its transit improvement measures and reports on the air quality impact of the fare increases in its next SIP revision, which the State was required to file by July 1, 1982. Sec. 7502 note, 7502(c).
 
 
 15
 In CCO I, we denied, with some reluctance, the petition for review brought to challenge EPA's conditional approval of New York's 1979 SIP revision. We were troubled by EPA's conditional approval technique, since it permitted New York's 1979 SIP revision to remain incomplete until a full four years after the date on which Congress had specified the revision should be made. Nevertheless, having previously permitted conditional approvals, see Friends of the Earth v. EPA, 499 F.2d 1118, 1124 (2d Cir.1974), we approved EPA's action. We noted that a remand was pointless in light of the fact that New York's 1982 SIP revision was due only a few weeks after our decision. However, in an effort to provide some assurance that EPA's conditional approval technique would not be a device by which New York could further evade its obligations under the Moynihan-Holtzman Amendment, we conditioned our own approval of EPA's action on the agency's adherence to seven requirements we laid down to govern EPA's consideration of New York's 1982 SIP revision. 683 F.2d at 662-63. Having been asked by EPA to approve its action, which approved the 1979 submission on condition that implementing details would be furnished in the 1982 submission, we in turn wanted some assurance that the agency would be rigorous in its consideration of the promised details. For example, we insisted that EPA determine, on the basis of the new details, whether the measures New York proposed to improve transit would meet "basic transportation needs" and whether the details would be sufficiently specific to permit monitoring of New York's progress in meeting those needs. Id. at 663.
 
 
 16
 While we were endeavoring to accommodate both EPA and New York in upholding the agency's questionable toleration of the State's incomplete effort to comply with the Moynihan-Holtzman Amendment, New York was preparing to take advantage of what it perceived to be new latitude provided by EPA in its 1980 issuance of policy guidance on the definition of "basic transportation needs." As the State explains in its brief in this review proceeding, it had received informal advice from EPA before 1980 that the agency interpreted the Moynihan-Holtzman Amendment to require real improvement in public transit systems as the price of abandoning bridge tolls. On that understanding, New York had committed itself to bus and subway transit improvements in its 1979 SIP revision. The 1980 policy guidance on "basic transportation needs," however, persuaded New York that meeting "basic transportation needs" did not necessarily require transit improvements. The State focused on the language of the policy guidance that called for the development of transit measures "that are necessary to maintain mobility where transportation control strategies are implemented." New York understood "transportation control" to include two approaches: (1) controlling automobile traffic to improve its flow, for example, by lessening automobile idling time, and (2) reducing automobile traffic, for example, by imposing tolls. As New York points out, only measures in the latter category risk impairing mobility of automobile riders. New York understands EPA's policy guidance to mean, therefore, that meeting "basic transportation needs" requires only the maintenance or addition of mass transit capacity sufficient to handle whatever volume of automobile riders will be shifted to mass transit by the adoption of those transportation control strategies that reduce automobile traffic.
 
 
 17
 Reexamining its transit proposals in light of the new policy guidance, New York determined that only one of its proposals had the potential for interfering with mobility of travelers by reducing automobile use--a computerized traffic system to be implemented in the central business district of New York City. This system was estimated to divert, at most, 100,000 automobile riders to mass transit. New York calculated that subway ridership was down by 300,000 from 1979 levels. In the State's view the City's subway system could easily accommodate the maximum number of travelers that might be diverted to mass transit because of the one transportation control measure that might curtail automobile traffic. In framing its 1982 SIP revision, New York concluded that it was already meeting "basic transportation needs" and therefore was not required to commit itself to any transit improvements, much less to supply details for the measures promised in its 1979 submission.
 
 
 18
 EPA initially proposed to disapprove New York's 1982 SIP revision. 48 Fed.Reg. 5139 (1983). The agency did not challenge New York's determination that no public transportation improvements were required to satisfy the Moynihan-Holtzman Amendment because "basic transportation needs," as both New York and EPA then understood that term, were already being met. Id. at 5143. The 1982 submission was found deficient, however, for failure to demonstrate, as required by the Moynihan-Holtzman Amendment, that transportation control measures would provide emission reductions equivalent to what would have been achieved with continued imposition of the bridge tolls. In addition, EPA was not persuaded that the State had proposed to adopt all reasonably available control measures to meet the national air quality standards for ozone and carbon monoxide by 1987. Adoption of such measures is required by Part D of the Act for states like New York that have not met these standards by the original statutory deadlines. Sec. 7502(b)(2).
 
 
 19
 In response to EPA's proposed rejection, New York submitted on February 2, 1984, a substantial revision of its 1982 submission. This 1984 supplement proposed new measures designed to assure that ozone and carbon monoxide standards would be met by 1987. It also proposed new transportation control measures and endeavored to demonstrate that with these new measures the equivalent emission reduction requirement would be easily met. Finally, the 1984 supplement reanalyzed the impact of the proposed transportation control measures on mobility and renewed the conclusion that "basic transportation needs" would continue to be met because the existing transit system could handle the relatively small number of persons likely to be diverted from automobiles.
 
 
 20
 On May 1, 1984, EPA published a notice of proposed approval of New York's 1982 SIP revision, as modified by the 1984 supplement. 49 Fed.Reg. 18,558 (1984). After receiving and assessing comments, including those from the petitioners, EPA gave final approval to New York's 1982 SIP revision on June 17, 1985. 50 Fed.Reg. 25,073 (1985). The agency concluded that New York had adequately provided for attainment of ozone and carbon monoxide standards by 1987, 49 Fed.Reg. at 18,563, 18,565; 50 Fed.Reg. at 25,078, and had demonstrated that transportation control measures would provide for equivalent emission reduction, 49 Fed.Reg. at 18,566. EPA also concluded that New York had correctly defined "basic transportation needs," in conformity with the agency's 1980 policy guidance, to mean maintaining mobility of riders diverted from automobiles, that mass transit capacity was adequate to absorb riders who might be diverted by a control measure, and that, since mobility is maintained, "no transit improvements are necessary to meet basic transportation needs." 49 Fed.Reg. at 18,566; see 50 Fed.Reg. at 25,076. The pending petition for review challenges EPA's final approval of New York's 1982 SIP revision.
 
 Discussion
 
 21
 The primary issue is whether EPA is entitled to rule that meeting "basic transportation needs," as required by the Moynihan-Holtzman Amendment, requires only providing the level of transit service sufficient to sustain mobility of riders diverted from automobiles by transportation control measures. We confess that we are surprised to learn that EPA regards this as a sufficient test for meeting "basic transportation needs." At the time we reviewed New York's 1979 SIP revision in CCO I, we thought that the quid pro quo demanded by the Moynihan-Holtzman Amendment as the price for eliminating bridge tolls was a commitment to make improvements to a mass transit system. Evidently sharing this view in 1979, New York proposed a series of mass transit improvements. When EPA gave conditional approval to New York's 1979 SIP revision, it gave no hint that it regarded the proposed transit improvements as superfluous. When we approved the agency's conditional approval, we specified that, in view of the lack of detail concerning the proposed improvements, EPA would have to determine carefully, in assessing the then imminent 1982 submission, whether the transportation proposals as detailed would meet New York's "basic transportation needs" "by providing for a real improvement in public transportation for 1982 and each year thereafter." CCO I, supra, 683 F.2d at 663. Though the agency's 1980 proposed policy guidance on basic transportation needs was then known, no one had urged during the litigation over New York's 1979 SIP revision that "maintenance of mobility" alone could be sufficient to meet "basic transportation needs."
 
 
 22
 Of course, our surprise at the meaning EPA now extracts from its 1980 policy guidance does not mean that the agency has erred in its interpretation of the statute. Nor has New York necessarily failed to observe statutory requirements simply because it redefined its "basic transportation needs" between its 1979 and 1982 submissions in light of EPA's 1980 policy guidance. The issue to be decided is whether EPA is entitled to conclude that "basic transportation needs" are met when mobility of riders diverted from automobiles is maintained.
 
 
 23
 The language of the statute does not provide a clear answer. Remarkably, in a statute so prolix and so larded with definitions, e.g., Secs. 7411(a), 7412(a), 7479, 7491(g), 7501, there is no statutory definition of "basic transportation needs." EPA assures us that the phrase has no accepted meaning in the fields of environmental control or transportation regulation. One might fairly read section 7410(c)(5)(B)(i) to mean that public transportation must be either established, where non-existent, or expanded or improved, where already established. But it is also plausible to focus, as EPA does, on the fact that the statute ties the establishment, expansion, or improvement of public transportation to the meeting of "basic transportation needs." If meeting "basic transportation needs" is the only occasion for expanding or improving public transportation, then the meaning of that phrase obviously determines the reach of the entire provision. The drafters may simply have assumed, with most users of mass transit systems, that no system currently meets "basic transportation needs" and that any effort to reach that goal would necessarily require some expansion or improvement. On the other hand, EPA contends that meeting "basic transportation needs" is not just a universal aspiration of commuters but is a precise concept, the content of which derives from the Amendment's requirement of "measures ... to ... (ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards." Sec. 7410(c)(5)(B).[2] In effect, EPA reads subsection (B)(ii)'s requirement of transportation control measures back into subsection (B)(i) so that action to meet "basic transportation needs" is required only when transportation control measures are required, and then only when the required transportation control measures curtail automobile use to such an extent that more automobile riders are diverted to mass transit than the transit system can accommodate. Under this reading, "basic transportation needs" may be met merely by maintaining mobility of diverted automobile riders.
 
 
 24
 The legislative history of the Amendment provides no satisfactory indication as to whether EPA's somewhat strained reading is correct. The House Report accompanying the 1977 amendments to the Act, which included the Moynihan-Holtzman Amendment, noted that some transportation controls "may be practical only when adequate public transportation alternatives [are] available to meet basic transportation needs." H.Rep. No. 95-294, 95th Cong., 1st Sess. 229 (1977), U.S. Code Cong. & Admin.News 1977, pp. 1077, 1308. That states a necessary condition for some transportation control measures, but it does not follow that "basic transportation needs" are sufficiently met whenever public transportation alternatives are available to accommodate automobile riders diverted by such control measures. No other passage in the legislative history purports to define or amplify the meaning of "basic transportation needs." Though the legislative history contains some references to improving mass transit,[3] there is no explication of the phrase "basic transportation needs," nor any indication, one way or the other, as to whether mass transit is to be improved, as EPA has ruled, only when "basic transportation needs" are not being met.
 
 
 25
 If we were construing a statute concerned primarily with transportation, we would seriously doubt the correctness of EPA's limited reading of the Moynihan-Holtzman Amendment, despite the deference normally due an agency in interpreting ambiguities in a statute it administers. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984). But the Clean Air Act is a congressional effort to improve air quality, not to improve mass transit. So long as the agency interprets the statute it is administering in a manner consistent with achieving the basic goal of the statute, we are not inclined to reject its interpretation, even though we might (and did in 1982) think that a more generous reading was appropriate. If those who sponsored and voted for the Moynihan-Holtzman Amendment thought that they were obtaining mass transit improvements as the price for removing bridge tolls, as some of them may well have thought, they unfortunately used language of such ambiguity that the administering agency is entitled to disappoint them. Since we cannot say that the agency's interpretation is beyond the bounds of fair interpretation, we will accept it and leave to Congress the task of providing a more specific indication of what it might wish to achieve.
 
 
 26
 On EPA's view of meeting "basic transportation needs," there is little doubt that New York's 1982 SIP revision is not deficient. Petitioners make no adequate showing that the agency erred in concluding that the traffic control system for New York City's central business district is the only proposed transportation control measure with the potential for diverting automobile riders and that the City's transit system has adequate capacity to accommodate the maximum number of riders estimated to be diverted. If New York may meet "basic transportation needs" simply by maintaining mobility of diverted automobile riders, then those needs are being met. Since meeting those needs, as thus defined, no longer requires a commitment to adopt transit improvements, the conditions we imposed in CCO I for EPA's assessment of the expected implementing details of such improvements are no longer applicable.[4]
 
 
 27
 In fairness to New York, we should point out that the State has not abandoned its efforts to improve mass transit in the New York City metropolitan area. Though the 1982 SIP revision does not commit the State to enforceable transit improvement measures to the extent contemplated by the 1979 SIP revision, funding to improve mass transit has been significantly increased. The annual capital budget for bus, subway, and commuter rail operations of the Metropolitan Transportation Authority has been increased from $384 million, committed in the 1979 SIP revision, to $1,439 million in the 1982-1986 period, committed in the 1982 SIP revision. In that five-year period, more than $7 billion is being spent to upgrade and improve the mass transit system.
 
 
 28
 Petitioners' remaining challenge to EPA's approval of New York's compliance with the Moynihan-Holtzman Amendment requires far less discussion. The equivalent emission reduction requirement of the Amendment was fully met. The bridge tolls were estimated to reduce automobile traffic 0.4 per cent, with a consequent reduction of emission of volatile organic compounds of between 500 and 200 tons for each of the years between 1982 and 1987. 49 Fed.Reg. at 18,566. Transportation control measures included in the 1982 SIP revision were demonstrated by the 1984 supplement to result in annual reduction of volatile organic compound emissions several times what would have been achieved by the bridge tolls. Petitioners complain that no precise findings were made with respect to equivalent reduction of localized carbon monoxide concentrations. However, the agency satisfactorily responds that New York's transportation control measures will sufficiently reduce carbon monoxide concentrations as well as emissions of volatile organic compounds. Moreover, the bridge tolls would have added to carbon monoxide concentrations because of automobile idling at toll plazas. Petitioners are also incorrect in contending that the equivalent emissions reduction requirement obliges the State to commit new funds for mass transit equivalent to the funds that would have been generated by the tolls.[5] The equivalent reduction requirement concerns emissions, not financing.
 
 
 29
 At oral argument, petitioners contended that they believed the 1982 SIP revision was deficient for reasons other than those concerning compliance with the Moynihan-Holtzman Amendment. We afforded petitioners an opportunity to brief those allegations and afforded EPA and New York an opportunity to respond. None of petitioners' supplemental objections has merit. New York has supplied sufficient detail concerning the program it has adopted to attain the ozone and carbon monoxide standards by 1987. The detail suffices to permit EPA to determine that the proposed strategies will meet the national air quality standards, see Friends of the Earth v. EPA, supra, 499 F.2d at 1123-24, and to provide the basis for enforcement, see CCO I, supra, 683 F.2d at 657. Petitioners complain that no part of the SIP revision "effectively relates actual measurement of air quality to the models and projections being made." Supplemental Brief for Petitioners at 10. It is not clear whether petitioners are faulting the use of models to project anticipated results or claiming inadequate monitoring of progress toward those results. Either complaint fails. Modeling is appropriate, see Cincinnati Gas & Electric Co. v. Costle, 632 F.2d 14 (6th Cir.1980), especially for the predictions EPA must make in assessing the likely results to be achieved by programs described in a SIP revision. New York has committed itself to adequate monitoring of air quality and to sufficient reporting of results to EPA. Contrary to petitioners' claim, the SIP revision sufficiently assures necessary funding and personnel to carry out the promised programs. The renewed challenge to compliance with the equivalent emission reduction requirement contains nothing of substance.
 
 
 30
 Petitioners also fault EPA for the time the agency has taken to approve the 1982 SIP revision. We indicated in CCO I that SIP revisions must be approved or disapproved within four months of submission, the same time period specified for action upon initial submissions, Sec. 7410(a)(2). CCO I, supra, 683 F.2d at 651-52 n. 2. EPA disagrees with this view, as does the Sixth Circuit. See United States v. National Steel Corp., 767 F.2d 1176, 1183 n. 1 (6th Cir.1985). We remain concerned that New York's compliance with the Moynihan-Holtzman Amendment, due August 8, 1978, did not receive EPA's conditional approval until September 9, 1981, and that the promised implementing details were not finally approved until June 17, 1985. But, as we were obliged to note in CCO I, tardiness by EPA is not a basis for granting a petition for review of action that satisfies the substantive requirements of the Act. CCO I, supra, 683 F.2d at 661; see Connecticut Fund for the Environment, Inc. v. EPA, 672 F.2d 998, 1011 (2d Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982). The remedy for undue delay is an enforcement action in the district court under section 7604(a)(2).
 
 
 31
 Finally, petitioners complain that New York has not satisfied the requirement imposed on nonattainment areas to make "reasonable further progress" toward meeting national air quality standards by using "reasonably available control technology." Sec. 7502(b)(3). Most of the complaint in this regard concerns deficiencies in the 1979 SIP revision, which were noted by EPA and which have since been corrected. The 1982 SIP revision was properly found "in the judgment of the Administrator," Sec. 7501(1), to satisfy the statutory standard of "reasonable further progress."
 
 
 32
 The petition for review is denied.
 
 VAN GRAAFEILAND, Circuit Judge, concurring:
 
 33
 Because Judge Newman, who wrote this Court's 1982 opinion, is prepared to accept the almost complete disregard of the conditions laid down in that opinion, I concur. I do so with some reluctance, however, because I feel that both this Court and the residents of the City of New York have been treated rather shabbily in this litigation. This Court has had its prior opinion and the conditions laid down therein virtually ignored. The people of New York City have not received the measured improvement in transit service and facilities that were the intended quid pro quo for the elimination of bridge tolls. See 683 F.2d at 657. This Court will suffer no ill effects from what has taken place. Would that the same could be said for the residents of Manhattan.
 
 
 
 [1]
 None of the parties cites any subsequent agency action concerning the proposed rule, either to vacate what was proposed or to promulgate a final rule, and we have found none. The proposed rule apparently remains in limbo. Nor has any party questioned or supported EPA's authority to rely on policy guidance contained in a proposed but not promulgated rule. In St. George's University School of Medicine v. Bell, 514 F.Supp. 205, 209-10 (D.D.C.1981), an agency was permitted to rely on a proposed but not promulgated rule. The District Court in that case emphasized that the proposed rule did not alter any prior rule of the agency. Id. at 209. In the instant case, the policy guidance on "basic transportation needs" does not change any previously promulgated rule, though it retreats from informal advice that had been given by EPA to New York. That advice had interpreted meeting "basic transportation needs" to require not only maintenance of mobility of automobile riders diverted to mass transit as a result of transportation control measures but also "mak[ing] public transportation a viable and attractive alternative to use of the private automobile for all potential users." Letter from Administrator Costle to Governor Carey, June 20, 1978, reprinted as Addendum A to Proposed Disapproval of New York's 1979 SIP Revision, 45 Fed.Reg. 43,794, 43,808 (1980). In the absence of complaint by petitioners, we see no reason to preclude EPA from assessing New York's 1982 SIP revision in light of the policy guidance contained in the 1980 proposed rule interpreting "basic transportation needs" simply because a final rule has not been promulgated
 
 
 [2]
 "Transportation control measures" are strategies designed to reduce pollution by controlling or limiting motor vehicle use. CCO I, supra, 683 F.2d at 652 n. 3
 
 
 [3]
 Floor debate on the Amendment included the following statements: "The only requirement is that there be a strategy for the expansion or improvement in mass transit," 123 Cong.Rec. 18,121 (1977) (statement of Sen. Javits); "The Environmental Protection Administrator would have to void the tolls strategy if the Governor certified that he would, within 1 year, submit a revised plan that includes measures to improve mass transit," 123 Cong.Rec. 16,969 (1977) (statement of Rep. Holtzman); "The amendment ... further requires that New York State's clean air plan be revised to include measures for improving public transportation," 123 Cong.Rec. 16,970 (1977) (statement of Rep. Biaggi)
 
 
 [4]
 On this point, EPA has understood the conditions we imposed in CCO I better than its lawyers. The agency recognized that the conditions on which we denied the petition for review in CCO I must be reckoned with and did so explicitly in its approval of New York's 1982 SIP revision. 50 Fed.Reg. at 25,076. It rightly concluded that the conditions requiring assessment of transit improvements were no longer applicable since New York has permissibly met "basic transportation needs" without committing to transit improvements. By contrast, the agency's lawyers, in opposing the pending petition for review, dismiss the conditions we imposed as "dicta," which could not be binding on EPA's consideration of the 1982 submission, since such consideration had not then occurred. Brief for Respondents at 22 n. 14. Counsel apparently miss the irony of urging us in 1982 to approve EPA's use of the conditional approval technique, which imposed binding future commitments on New York, and then contending in this proceeding that the requirements we imposed on EPA as a condition of approving EPA's actions had no binding significance. Had the conditions of our approval been violated by EPA, instead of being rendered inapplicable by New York's permissible change of strategy, the consequence would have been either steps to secure compliance with the conditions of our mandate or the undoing of our approval
 
 
 [5]
 Explaining the Moynihan-Holtzman Amendment to the Senate, Senator Javits said, "There is no requirement in this amendment that revenues be added to the mass transit program in the same amount as would be anticipated from bridge toll revenues, or for that matter, that any particular amount of funding be added to the State's mass transit program." 123 Cong.Rec. 18,121 (1977)