**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**AM GENERAL CORPORATION,**
**Defendant–Appellee.**

No. 93–3538.

United States Court of Appeals,
Seventh Circuit.

Argued May 20, 1994.

Decided Sept. 1, 1994.

J. Carol Williams, Lois J. Schiffer, Dept. of Justice, Land & Natural Resources Div., Washington, DC, Andre Daugavietis, E.P.A., Region 5, Office of Regional Counsel, Chicago, IL, Peter A. Appel (argued), Dept. of Justice Land & Natural Resources Div., Washington, DC, Clifford D. Johnson, Asst. U.S. Atty., South Bend, IN, Frank Bentkover, Kathryn Smith, E.P.A., Office of Enforcement, Washington, DC, for U.S.

---

Bryan G. Tabler (argued), Peter J. Rusthoven, Barnes & Thornburg, Indianapolis, IN, for A.M. General Corp.

Percy Angelo, Kathleen M. Hennessey, Lyman C. Welch, Mayer, Brown & Platt, Chicago, IL, for Allsteel, Inc., amicus curiae.

Before POSNER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.

POSNER, Chief Judge.

The United States has appealed from the district court's dismissal of a civil penalty action brought against AM General Corporation under the Clean Air Act. 808 F.Supp. 1353 (N.D.Ind.1992). AM General manufactures the Hummer or HumVee—successor to the army jeep—at a plant in Mishawaka, Indiana. The Hummer requires special protective painting the application of which throws off volatile organic compounds (VOCs) that react with other chemicals to create ground-level ozone, a pollutant. At first, because Indiana did not have a state implementation plan for the control of ozone that the U.S. Environmental Protection Agency had approved, and because St. Joseph County, where Mishawaka is located, is an area that the EPA has yet to certify as having attained the goals set by the Clean Air Act, the Act forbade plant modifications that would increase the emission of VOCs. See 42 U.S.C. § 7410(a)(2)(I). (It is nine years since Indiana requested that St. Joseph County be redesignated an attainment area; the EPA has yet to act on the request.) The effect of this construction ban as it is called was to limit the Hummer plant to emitting 197.3 tons of VOCs a year—for, perhaps surprisingly, there is no exemption from the Clean Air Act for the production of goods essential to the national security.

But anticipating that a state implementation plan for ozone would soon be approved and that by lifting the construction ban the approval would allow the Hummer plant to emit 377 tons of VOCs a year, AM General modified the plant to enable it to increase its output of Hummers to a level that would scrape up against the new ceiling for emissions of VOCs; and it sought a permit from the St. Joseph County Health Department to operate at that higher level of emissions if and when the state plan was approved. The EPA recommended against the issuance of the permit, but the Department, which had already authorized AM General to make the necessary alterations to its plant, rejected the EPA's recommendation and issued the permit on February 6, 1986, effective when the plan was approved. Approval came just four days later, *Approval and Promulgation of Implementation Plans; Indiana*, 51 Fed. Reg. 4912, 4913 (Feb. 10, 1986), and on the following day the Hummer plant began humming at the higher level of production and emissions authorized by the permit. Although AM General did not have to make any physical alteration to increase the output of the plant—it had done that already, in anticipation of receiving the permit—the change in operation is, all concede, a "modification" of the Hummer plant within the meaning of the Clean Air Act. See 40 C.F.R. § 51.165(a)(1)(v).

The EPA received notification of the issuance of the permit on February 19, 1986, but it was not until four months later, on June 18, that it issued a finding of violation of the Clean Air Act to the State of Indiana and to St. Joseph County, and a notice of violation to AM General. These notices are required to be sent to the state authorities and the polluter, respectively, when the EPA believes that a violation is occurring. 42 U.S.C. § 7413(a)(1); *United States v. General Motors Corp.*, 876 F.2d 1060, 1063 (1st Cir.1989), aff'd, 496 U.S. 530, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990). The EPA deemed the permit invalid because it did not require the defendant either to achieve the lowest achievable rate of emissions or to offset any increased emissions of VOCs by requiring reductions from other sources. These requirements are found in Indiana's overall state implementation plan (not the plan approved in February 1986, which is specific to ozone). See 42 U.S.C. §§ 7503a(1), (2); Indiana Air Pollution Control Regulation APC–19, §§ 4b(4), 8. The county health department had, in the EPA's view, overlooked these requirements in issuing the permit to AM General. We shall not have to decide whether the EPA's view is correct.

The EPA followed up the finding and notice of violation the next year with this suit. It grounds the suit in section 113(b)(5) of the Clean Air Act, 42 U.S.C. § 7413(b)(5), which imposes a civil penalty of up to $25,000 per day on anyone who "attempts to construct or modify a major stationary source in any area with respect to which a finding under subsection (a)(5) of this section has been made." Subsection (a)(5), 42 U.S.C. § 7413(a)(5), closes the circle by providing that "whenever ... the Administrator finds that a State is not acting in compliance with [various provisions of the Clean Air Act or its regulations], he ... may bring a civil action under subsection (b)(5) of this section." The complaint seeks the maximum penalty (along with injunctive relief also authorized by section 7413(b)(5)), which in seven years has grown to more than $60 million, although the district judge has discretion to reduce the penalty if considerations of equity so dictate. 42 U.S.C. § 7413(b); *United States v. General Motors Corp., supra,* 876 F.2d at 1068.

■ The statutory provisions that we have quoted were amended in 1990. 42 U.S.C. §§ 7413(a)(5), (b)(3). The amendments do not seem pertinent, except that, as we shall see, they make the EPA's need to be able to bring this kind of case a little less acute; but in any event it is plain that they cannot be applied retroactively. See *Landgraf v. USI Film Products,* — U.S. —, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

■ We think it apparent from the text of the statute and the quasi-criminal character of civil-penalty actions that, as the district judge held, this suit is not authorized by the statute. The defendant modified its plant on February 11, when it implemented the permit it had received five days earlier. The finding of violation was made months later. Section 113(b)(5) authorizes suit whenever a person attempts to modify a major stationary source with respect to which a finding of violation *has* been made, implying that the finding precedes the attempt, not as here follows it. Someone who, though knowing that the EPA has found that the state in authorizing him to modify his plant is violating the Clean Air Act, goes ahead and modifies anyway is thumbing his nose at the EPA

and therefore acts at peril of having to pay a heavy civil penalty if the EPA is right. But if as in this case the modification occurs before the EPA has made such a finding, is authorized by a state permit valid on its face, and is completed before the EPA challenges the validity of the permit, the culpability is much less and it is not surprising that Congress would withhold the fell sanction of civil penalties.

We are not altogether sure why the EPA abandoned its original position in this case, that the suit was authorized by section 113(b)(2), 42 U.S.C. § 7413(b)(2), rather than (b)(5). Subsection (b)(2) authorizes civil penalty suits if the polluter continues violating any state implementation plan after receiving a notice of violation from the EPA pursuant to subsection (a)(1). (So (a)(1) is to (b)(2) as (a)(5) is to (b)(5).) That seems to describe this case; the overall state implementation plan places limitations on emissions that, the EPA contends, the Hummer plant as modified violates. The existence of this abandoned alternative route makes us somewhat skeptical about the agency's argument that it had no alternative to bringing suit in a case like this under section 7413(b)(5) until the 1990 amendments were enacted, which are not applicable to this case. For whereas (b)(5), read with its substantive counterpart (a)(5), allows the EPA to sue the source of the emissions (here, AM General) if the *state* has violated a state implementation plan, (b)(2), read with its substantive counterpart (a)(1), allows suit only if the *source* is violating a state implementation plan; and it is an unsettled question whether operating under a duly issued permit, albeit one that should not have been issued because it failed to impose requirements found in a state implementation plan, violates that plan. The statutory language implies "yes," 42 U.S.C. § 7413(a)(1), but *United States v. Solar Turbines, Inc.,* 732 F.Supp. 535, 539 (M.D.Pa. 1989), holds "no," and *Allsteel, Inc. v. EPA,* 25 F.3d 312 (6th Cir.1994), leaves the question open.

Even if we disregard (a)(1) and (b)(2), the EPA had an alternative remedy in this case. It could have appealed from the grant of the permit by the county health department to

the county's Pollution Appeals Board (see St. Joseph County Air Pollution Ordinance § 10.04.140), and could if necessary have obtained review in state court of that board's decision (see Administrative Adjudication Act, Ind.Code §§ 4–21.5–1–1 *et seq.*) with whatever interim relief might be appropriate and within the power of the Board or the state courts to grant. The EPA did not attempt to avail itself of this alternative to a civil penalty action. It seeks to excuse its failure to do so on the ground that it lacks the resources to make responsible appeal decisions within the very short deadlines allowed by state law—30 days to appeal to the Pollution Appeals Board (see St. Joseph County Air Pollution Control Ordinance § 10.04.140) and another 30 days to seek judicial review in state court of the board's action. Ind.Code § 4–21.5–5–5.

We do not know how common such state remedies are, whether they were in the contemplation of Congress when it enacted the Clean Air Act, and whether it would be utterly infeasible for the EPA, in view of resource constraints, to maneuver effectively in the state remedial system. For that matter we do not know whether it would be feasible for the EPA as a condition of approving a state implementation plan to require that the state provide adequate administrative and judicial remedies for violations of the plan, relaxing the deadlines that the EPA cannot meet. Fortunately we do not have to answer these difficult questions. For there is such a thing as an incomplete remedial scheme; and we cannot find in the text of the Clean Air Act, or elsewhere, any indication that Congress expressly or by implication meant to authorize the EPA to mount a collateral attack on a permit by bringing a civil penalty action as many as five years after the permit had been granted and the modification implemented, 28 U.S.C. § 2462, by which time a defendant would have accrued a potential liability in excess of $40 million even though it had been operating under a permit valid on its face and never before challenged. That would be a harsh remedy and we cannot be confident in the absence of any clues that it was one intended to be usable in the circumstances of this case.

The 1990 amendments plug the remedial gap by giving the EPA 45 days after a permit is issued by a state agency within which the EPA can review the permit and veto it. 42 U.S.C. § 7661d. Or at least they *will* plug the remedial gap, once the part of the amending statute that contains this provision becomes operative, the delay being due once again to the langorous pace at which the EPA proceeds. (Perhaps through no fault of its own. Resource constraints to one side, some of the EPA's exasperating delays reflect the protracted schedule for implementation prescribed by the Clean Air Act itself. See 42 U.S.C. § 7661a(d)(1).) The fact that Congress added this provision does not prove that the Act had a gap—implying that the civil penalty provision was, as we hold, not available—but it does not prove the opposite either. The primary responsibility for the Act's enforcement at the level of the individual plant has been lodged in the states rather than in the national EPA, so it would not be surprising if Congress did not equip the EPA with a complete quiver of enforcement arrows.

We need not decide what the EPA's rights would be in a case such as this if the finding or notice of violation had been issued after the defendant had begun to modify its stationary source but before the modification was completed, see *Allsteel, Inc. v. EPA, supra; United States v. Solar Turbines, Inc., supra,* as that was not the sequence here.

AFFIRMED.